**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

MARK BAKER, CORNERSTONE
GROWTH, LP, and all others similarly
situated,
                                                    **CLASS ACTION**

      Plaintiffs,
                                                      **JURY TRIAL DEMAND**
v.

COMERICA BANK,

      Defendant.
_____/

**CLASS ACTION COMPLAINT**

Plaintiffs Mark Baker and Cornerstone Growth LP, on behalf of themselves and all others similarly situated, sue Defendant Comerica Bank ("Comerica") on the grounds set forth below.

**INTRODUCTION**

1.      Plaintiffs bring this action on behalf of a proposed class of thousands of individuals who invested more than $1.2 billion in a series of related investment vehicles managed by Robert Shapiro under the Woodbridge name (the "Woodbridge Entities" or "Woodbridge"). Shapiro and his agents represented to investors that Woodbridge would use their funds to pay short-term, high-interest loans to third-party commercial real estate buyers who had not qualified for loans elsewhere. Woodbridge issued investors twelve- to eighteen-month promissory notes for these investments, called "First Position Commercial Mortgages" ("FPCMs"), which were purportedly secured by first-priority liens in the subject properties. Shapiro and his agents promised investors a 5-8% rate of return, to be paid from the even higher interest rates charged to third-party buyers. Woodbridge purportedly lent the buyers no more than two-thirds of the value of the properties purchased, further ensuring investors that their investments and interest payments would be

covered.   Woodbridge also managed seven private-placement fund offerings (the "Fund Offerings"), which pooled investor money for similar "loans" for five-year terms.

2.      The Woodbridge investments were a classic Ponzi scheme, masterminded by Shapiro.  The third-party commercial real estate buyers who took "mortgages" from Woodbridge investors were, in fact, hundreds of shell LLCs owned and controlled by Shapiro.  The LLCs had no sources of income or bank accounts, and never made any loan payments to Woodbridge. Shapiro kept the operation afloat by pursuing a continuous infusion of new-investor funds, which he would then use to make interest and principal payments to earlier investors, pay commissions to his sales agents, and fund his extravagant lifestyle.  When FPCM investors' twelve- to eighteen-month promissory notes would come due, Woodbridge would encourage them to roll their investments over into one of his five-year term fund offerings or sign another short-term promissory note, thus postponing the date on which Woodbridge would be required to pay the principal balance of the investors' "loans."

3.      Defendant Comerica Bank held and managed the Woodbridge bank accounts, through which Shapiro ran thousands of transactions and more than a billion dollars to operate his fraudulent scheme. Shapiro commingled Woodbridge funds among the Comerica accounts, and withdrew funds freely for purposes inconsistent with an investment manager's duties to his investors.  Shapiro was the sole signatory on all Woodbridge accounts at Comerica for the duration of his fraudulent scheme, and hand-signed every check to Woodbridge's investors and sales agents.

4.      On December 1, 2017, after almost five years in operation, Woodbridge and Shapiro missed their first interest payments to investors.  Days later, on December 4, 2017, Shapiro

10Z7355

caused most of his companies to be placed into Chapter 11 bankruptcy. Shapiro and Woodbridge still owe more than $961 million to investors in the Woodbridge scheme.

5. On December 20, 2017, the United States Securities and Exchange Commission (the "SEC") filed a multi-count complaint in the Southern District of Florida against Shapiro, his wife Jeri, and numerous Woodbridge-related entities, bringing counts for violations of the Securities and the Exchange Act, including claims for violations of Section 10(b) and 10b-5, and for control-person liability. *See SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla.) (the "SEC Enforcement Action").

6. Plaintiffs bring this action on behalf of a class of investors seeking to recover their losses resulting from the Woodbridge Ponzi scheme.

**PARTIES AND RELEVANT NON-PARTIES**

**A.    PLAINTIFFS**

7. Plaintiff Mark Baker is a citizen of the State of Florida and resides in Weston, Florida. Mr. Baker has invested more than $400,000 with Woodbridge.

8. Plaintiff Cornerstone Growth LP ("Cornerstone Growth") is a limited partnership with its principal place of business in Las Vegas, Nevada. Cornerstone Growth invested $50,000 with Woodbridge.

**B.    DEFENDANT**

9. Defendant COMERICA BANK is a Texas banking association with its principal place of business in Dallas, Texas. Comerica is chartered in the State of Texas and subject to supervision and regulation by the Texas Department of Banking under the Texas Finance Code. Comerica Bank is also a member of the Federal Reserve System under the Federal Reserve Act and thus subject to federal regulations.

10Z7355

10. Comerica Bank is a subsidiary of Comerica Incorporated, which is incorporated under Delaware law and headquartered in Dallas, Texas.

11. Comerica Incorporated acknowledged in its 2016 Form 10-K, that it and its subsidiaries are subject to United States anti-money laundering laws and regulations. Comerica Incorporated represents on its website that it "and all of its subsidiaries, including Comerica Bank, comply with the Bank Secrecy Act (BSA) and USA PATRIOT Act requirements."[1]

12. All Woodbridge bank accounts were maintained at Comerica.

**C**.    **RELEVANT NON-PARTIES**

13. Robert H. Shapiro is a citizen of Sherman Oaks, California, maintains a residence in Aspen, Colorado, and is registered to vote in Florida. His voter information lists a South Florida address.  Before December 2017, Shapiro served as Woodbridge's CEO, trustee of the RS Protection Trust, and sole owner and operator of most of the entities comprising the Woodbridge Group Enterprise. Woodbridge was the principal operating company of Shapiro's businesses and employed approximately 140 people in offices in six states, including Florida.

14. At all relevant times, Shapiro maintained complete control over the Woodbridge entities and was the sole signatory on Woodbridge's bank accounts at Comerica.

15. The Woodbridge Group Enterprise operates through a network of affiliated companies that own the various assets comprising its business. All of these companies are directly or indirectly owned by RS Protection Trust.

16. Woodbridge Group of Companies, LLC is a financial company based in Sherman Oaks that was formed in 2014. It served as the main company through which Shapiro operated the

---

[1]    Comerica    Bank,    Anti-Money    Laundering    Compliance,    *available    at* http://investor.comerica.com/phoenix.zhtml?c=114699&p=irol-govmoney.

4

Woodbridge Group Enterprise during the relevant time period. It consisted of approximately 140 employees across six states, including employees located in Boca Raton, Florida, where Woodbridge Group of Companies, LLC formerly operated as Woodbridge Structured Funding, LLC, was headquartered as recently as September 2016, according to an annual report filed by Shapiro with the Florida Division of Corporations.

17.    RS Protection Trust is an irrevocable trust settled under Nevada law and controlled by Shapiro. He serves as the trustee, and members of his family are the sole beneficiaries of the trust. RS Protection Trust holds all of Shapiro's business entities and personal assets, including Woodbridge Group Enterprise companies.

18.    WMF Management, LLC is a California LLC controlled by Shapiro. WMF is a holding company for many of the companies comprising the Woodbridge Group Enterprise, all of which Shapiro controlled and operated, and which include Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC.

19.    The Relevant Non-Parties set forth above are not named as defendants in this action. This complaint does not seek to assert any claim or obtain any relief that falls within the exclusive jurisdiction of the pending bankruptcy proceeding or SEC enforcement action. This complaint does not involve any claim subject to the automatic stay of bankruptcy-related claims under 11 U.S.C. § 362(a).

10Z7355

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4; 28 U.S.C. § 1332(d)(2).

21.     Plaintiffs are citizens of Florida and Nevada and Defendant Comerica is a citizen of Texas.

22.     The amount in controversy exceeds $5,000,000 and there are at least one hundred members in the putative class.

23.     The Court has personal jurisdiction over Comerica because it engages in substantial business activity in Florida, with several branch offices in South Florida including locations at 100 NE 3rd Ave, Ft. Lauderdale, FL 33301; 1675 N. Military Trail, Boca Raton, FL 33486; 1 S. Federal Highway, Boca Raton, FL 33432; and 2800 Weston Rd., Weston, FL 33331 and because it aided and abetted Shapiro's Ponzi scheme and misappropriation of investor funds in Florida. Woodbridge raised a substantial amount of investor funds from hundreds of Florida residents, and the Woodbridge entities employed twenty sales agents in the Southern District of Florida alone. Shapiro maintains an address in Florida; Woodbridge's controller was based in Boca Raton, Florida; and the corporate affiliate of Woodbridge Group of Companies, LLC was based in Florida.

24.     Venue is proper in this District under 28 U.S.C. § 1391 because Comerica transacts business and may be found in this District and is subject to personal jurisdiction and Plaintiff Baker is a Florida citizen.

25.     All conditions precedent to this action have occurred, been performed, or have been waived.

10Z7355

## FACTUAL ALLEGATIONS

### The Woodbridge Investment Scheme

26.     Robert Shapiro ran a Ponzi scheme using Woodbridge entities from July 2012 through December 2017. Woodbridge raised money by issuing promissory notes to investors in exchange for funds that it would purportedly use to offer commercial real estate buyers high-interest mortgages, and through private placement subscription arrangements through which investors purchased units in Woodbridge funds. The promissory notes, or FPCMs, typically had terms of twelve to eighteen months and Woodbridge marketed them as paying 5%-8% annual returns on a monthly basis.

27.     Once the twelve- to eighteen-month terms expired, and the time came to return investors' principal, Woodbridge would encourage investors to roll their investments over into a subscription offering or another short-term promissory note. The subscription offerings—the "Fund Offerings"—typically had five-year terms, and were marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits. Neither type of investment was ever registered with the SEC or another government agency.

28.     Woodbridge represented to investors that it would use their funds for real estate acquisitions and investments, including in Woodbridge's own FPCMs. Woodbridge told investors that it would pay their returns from the interest a Woodbridge affiliate would earn from the commercial estate buyers who had taken mortgages from a Woodbridge affiliate at rates of 11-15%.  According to Woodbridge, these buyers were commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing.  Woodbridge told investors that their investment returns would be paid from

7

the third-party buyers' interest payments, and promised them a first-position "lien" interest in the underlying properties, or priority over any other liens or claims on a property if the property owner defaulted. In fact, however, Woodbridge directly applied investor funds to pay other investors' returns.

29.     Woodbridge also assured investors that their "loans" carried little risk.  The "loans" were purportedly secured by the underlying collateral—the commercial properties that the third-party buyers would purchase with their funds. Woodbridge assured investors that the borrowers would be obligated to repay their loans after one year, and that in the event of a default, Woodbridge would foreclose and recover the balance of the loan.  Woodbridge also told investors that the third-party buyers had mortgaged only about two-thirds of the value of the real estate securing the transaction with Woodbridge, touting "low loan to value ratios that help protect lenders [the investors] when borrowers encounter distress" and ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."  Woodbridge further represented to investors that it had conducted all due diligence, including title search and appraisal, on the commercial property and borrower.[2]

30.     Woodbridge employed a sales team of approximately thirty in-house employees who operated within Woodbridge's offices. Woodbridge also relied on a network of hundreds of external sales agents to solicit investments from the public through television, radio, and newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations. Virtually none of these sales agents were registered with any regulatory agency.

---

[2]  Woodbridge also told investors that it had another revenue source from "flipping" properties, i.e., buying them to develop and then sell for a profit.

31.     Woodbridge's marketing materials included the following graphic purporting to explain the FPCMs:



**Now is the time to forego old-fashioned wealth building solutions.**

Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?

Let us help you protect your retirement funds from market volatility. We succeed when you succeed. It's that simple.

32.     The majority of the purported third-party borrowers—the "owner" and "property owner" in parts 2 and 3 of the above marketing graphic—were hundreds of Shapiro-owned and -controlled LLCs.  The LLCs had no bank accounts or sources of income, and never made any loan payments to Woodbridge. Shapiro and his sales team concealed these facts from investors.

33.     Shapiro supported Woodbridge's business operations almost entirely by raising new investor funds and using them to pay returns to existing investors. Woodbridge raised at least $1.22 billion from FPCM and Fund Offering investors but issued only approximately $675 million in "loans" for real estate purportedly securing the investments.  Instead of generating

1

the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers— far less than required to operate Woodbridge's business and pay investor returns. Notwithstanding this shortfall, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments. Woodbridge spent another $172 million on operating expenses, including $64.5 million for sales commissions and $44 million for payroll, and $21.2 million to support Shapiro's lavish lifestyle.

34.    Shapiro needed a continuous infusion of new investor funds to keep the Woodbridge Ponzi scheme afloat.  He also needed FPCM investors to roll their investments over at the end of the term, ideally into longer-term Fund Offerings, so that Woodbridge could avoid repaying the principal on their investments.

35.    To generate more investments, Woodbridge aggressively promoted the FPCM notes by offering incentives to brokers who recommended these investments to their clients. Woodbridge also established a program called "Pass It On," through which brokers were encouraged to inform their colleagues about the FPCM notes. Under that program, a referring broker would earn 25 basis points on each FPCM sale closed by a broker whom he or she referred.

36.    Between July 2012 and December 2017, Woodbridge raised more than $1.22 billion from more than 8,400 investors nationwide.  On December 1, 2017, however, still owing more than $961 million in principal to investors, Woodbridge and Shapiro missed their first interest payments to investors. On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy.

10Z7355

## Comerica Knowingly Provided Substantial Assistance to the Woodbridge Fraud

37.     Shapiro ran his Ponzi scheme through Woodbridge accounts that he opened at Comerica Bank.  Shapiro was the lone signatory for the Woodbridge accounts at Comerica, through which he ran more than a billion dollars in transactions, and insisted on signing all checks on Woodbridge's behalf.  He transferred investor funds freely among the Comerica accounts, commingled investor funds, and disbursed investor funds to other investors, his own accounts, and his wife's accounts through thousands of account transactions at Comerica.

38.     Shapiro could not have run his scheme undetected for so many years without Comerica's knowing and substantial assistance.  Federal laws and regulations require Comerica to "know its customers," which includes gathering information about individuals who control accounts at the bank. The Bank Secrecy Act also requires Comerica to develop and maintain compliance and due diligence programs, which provide the bank with a means of identifying atypical or suspicious banking transactions for each customer.  The higher the risk presented by a customer's accounts, the higher the scrutiny the bank must exercise.   Ultimately, banks and their personnel must be able to identify money-laundering "red flags," including repetitive or unusual account activity, transfers of funds among related accounts, and transactions inconsistent with the accountholder's business, and take appropriate action.[3]

---

[3] Other examples of "red flags" listed in the Federal Financial Institutions Council's BSA/AML Examination Manual include:  (1) fund transfers sent or received from the same person to or from different accounts; (2) depositing of funds into several accounts that are later consolidated into a master account; (3) large fund transfers sent in round dollar amounts; (4) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (5) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (6) payments without links to legitimate contracts; (7) fund transfers containing limited content and lacking related party information; (8) transacting business sharing the same address; and (9) an unusually large number of persons or entities receiving fund transfers from one company.

10Z7355

39.     The transactions that Shapiro ran through the Woodbridge account at Comerica were marked by indicia of fraud and should have raised numerous red flags for trained Comerica personnel.   For example:

(a)     Shapiro's insistence on serving as the sole signatory for accounts covering thousands of transactions and signing all checks by hand was highly unusual given the size and scope of the Woodbridge enterprise.

(b)     Shapiro transferred funds from separate fund accounts and commingled them in a Woodbridge operating account, which he controlled. His commingling of assets involved around $1.66 billion in transfers and nearly 11,000 Comerica account transactions.

(c)     Shapiro used $368 in new investor funds held in Comerica accounts to pay earlier investors in the Woodbridge Entities.

(d)     Shapiro applied funds from Woodbridge's Comerica accounts toward $1.4 million on luxury retail purchases, $1.6 million on home furnishings, $1.2 million in alimony, $340,000 on luxury cars, and $400,000 on jewelry.

(e)     Woodbridge raised at least $1.22 billion from investors, most purportedly secured by third-party mortgage loans, but issued only $675 million in such loans. The loans generated only $13.7 million from bona fide third-party borrowers, instead of generating the substantial interest promised, which was much less than was required to operate Woodbridge's business and pay returns to the investors.

(f)     Shapiro used investor funds in Comerica accounts to purchase almost 200 properties in the Los Angeles and Aspen areas for around $675 million. The net returns from those properties have been nominal, with many of the properties remaining undeveloped. Woodbridge's generous intake of investor funds was not matched by corresponding real-estate development or lending.

(g)     Woodbridge made payments to Shapiro's wife, Jeri, and her company, Schwartz Media, from the Comerica accounts.

(h)     Woodbridge, a billion-dollar enterprise, relied on a controller in a Florida satellite office who was not a certified public accountant.

.

40.     Despite these indicia of fraud, Comerica continued to provide Shapiro with the banking support and account platforms needed to carry out his scheme, and failed to report his fraudulent conduct or close his accounts, continuing to execute the transfers necessary to the

continuation of the fraud.  This remained so even after state and federal proceedings had brought Woodbridge's violations to light.

## The Fraud Emerges

41.     State and federal regulators have investigated the Woodbridge fraud. Five state regulators have issued cease-and-desist or similar orders based on Woodbridge's securities fraud and sales of unregistered securities, and several others have initiated proceedings against Woodbridge.  The first state penalties were levied against Woodbridge entities in May of 2015.

42.     The SEC has been investigating Shapiro and Woodbridge since at least September 2016. The SEC's investigation has focused on Woodbridge's unregistered sale of securities and whether it "is operating a fraud on its investors."  Woodbridge has refused to cooperate with the SEC investigations.

43.     On December 20, 2017, the SEC filed a civil complaint for injunctive and other relief against Shapiro, his wife Jeri, and numerous Woodbridge- and related entities in the Southern District of Florida, alleging that Shapiro had been running a Ponzi scheme through the Woodbridge entities, raising in excess of $1.22 billion and "falsely selling Woodbridge's investments as 'safe' and 'secure.'" The SEC explained that Shapiro and Woodbridge had commingled investor funds in Woodbridge's operating account immediately after deposit, and then used the funds to run his scheme by paying "interest" to earlier investors and paying commissions to his sales agents, among other things. The SEC alleges that Shapiro also spent more than $21 million of investor funds "on extravagant personal expenditures."

44.     The Court ordered a temporary asset freeze and sworn accounting of all Woodbridge accounts on December 20, 2017.

10Z7355

45.     The SEC does not seek restitution for the investors who face a substantial risk of losing their investments.

**The Woodbridge Bankruptcy**

46.     On December 4, 2017, Woodbridge declared bankruptcy under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Woodbridge has attempted to use this voluntary bankruptcy proceeding to procure a stay of the SEC subpoena enforcement actions.

47.     Woodbridge stated in the bankruptcy action that it is now transitioning to an institutional fundraising model, and that it has removed Shapiro from control over the entities and replaced him with an independent manager. Nevertheless, Woodbridge agreed to keep on Shapiro as a consultant, pay him $175,000 per month, allow him to continue to use multi-million dollar Woodbridge-owned properties in Los Angeles and Aspen at below-market rents, and give him the authority to remove the supposedly independent manager.

48.     In the bankruptcy proceeding, Woodbridge for the first time asserted the position that the FPCM noteholders, who comprise the vast majority of the creditors, with $750 million of debt outstanding, are in fact unsecured and should lose their entire investment. A footnote in the declaration of the newly appointed independent manager states:

> It appears that few, if any, Noteholders have taken proper steps to perfect their interest in the Notes pursuant to either of sections 9-312(a) or 9-313(a) of the Uniform Commercial Code ("UCC"), which provide that a security interest in promissory notes (such as the collateral securing the Notes) must be perfected by taking possession of the underlying notes or by the filing of a UCC-1 financing statement describing the underlying notes, respectively. The Debtors have confirmed that no Noteholder is in possession of any of the collateral securing the Notes. Further, on information and belief and based on an investigation, no Noteholder has filed a UCC-1 financing statement with respect to any of the collateral securing the Notes in Delaware, the jurisdiction of the Funds. It therefore appears that any security interests held by the Noteholders is avoidable, such that the Noteholders' claims will ultimately be treated as unsecured claims in these

Chapter 11 Cases. The Debtors intend to commence adversary proceedings seeking the avoidance of these security interests.[4]

49.     Woodbridge's position in the foregoing respect contradicts its promises to the FPCM noteholders in its offering and promotional materials. Those materials make no mention of any need on the part of investors to "perfect" their security interests, but state unequivocally:

- "Secured by commercial real estate";

- "Recorded first lien position";

- "Woodbridge hereby grants to the Lender a security interest in all of the Woodbridge's [sic] present and future right, title and interest in and to any and all of [the collateral]"; and

- "This note will be secured inter alia by the Collateral Assignment Documents upon execution thereof."

**Plaintiffs' Woodbridge Investments**

**Mark Baker**

50.     Plaintiff Mark Baker invested funds with Woodbridge on numerous occasions over the course of more than two years.  He invested funds directly and through a self-directed Investment Retirement Account ("IRA") held by Provident Trust Group ("Provident").

51.     Baker invested funds in Woodbridge Mortgage Investment Fund 3, LLC, directly with Woodbridge as follows:

(a)  $25,000 on January 25, 2015, purportedly secured by a first-priority lien on real property identified as "Hidden Ridge."

(b)  $25,000 on February 18, 2016, purportedly secured by a first-priority lien on real property identified as "Saint Cloud Road."

---

[4] *In re: Woodbridge Grp. of Cos., LLC, et al.*, No. 17-12560 (D. Del.) [D.E. 12] at, fn. 9.

    (c) $40,000 on December 9, 2016, purportedly secured by a first-priority lien on real property identified as "Tanager Construction."

    (d) $35,000 on February 16, 2016, purportedly secured by a first-priority lien on real property identified as "Sarbonne Road."

    (e) $35,000 on March 14, 2017, purportedly secured by a first-priority lien on real property identified as "Sarbonne Road."

52.      Baker invested funds in Woodbridge Mortgage Investment Fund 3A, LLC directly with Woodbridge as follows:

    (a) $25,000 on March 14, 2016, purportedly secured by a first-priority lien on real property identified as "Carla Ridge Three."

    (b) $25,000 on April 28, 2016, purportedly secured by a first-priority lien on real property identified as "Carla Ridge Three."

53.      Baker invested funds in Woodbridge Mortgage Investment Fund 3, LLC through his Provident IRA as follows:

    (a) $100,000 on February 16, 2016, purportedly secured by a first-priority lien on real property identified as "Silverbrook Drive."

    (b) $100,000 on February 16, 2016, purportedly secured by a first-priority lien on real property identified as "Sarbonne Road."

    (c) $104,500 on February 25, 2016, purportedly secured by a first-priority lien on real property identified as "Laurel Way."

    (d) $100,000 on May 31, 2016, purportedly secured by a first-priority lien on real property also identified as "Silverbrook Drive."

    (e) $50,000 on July 21, 2016, purportedly secured by a first-priority lien on real property identified as "Walden."

    (f) $100,000 on August 2, 2016, purportedly secured by a first-priority lien on real property identified as "Hopkins Avenue."

    (g) $100,000 on March 10, 2017, purportedly secured by a first-priority lien on real property identified as "Sarbonne Road."

    (h) $104,500 on March 24, 2017, purportedly secured by a first-priority lien on real property identified as "Laurel Way."

10Z7355

54.     After certain of Mr. Baker's investments with Woodbridge reached the end of their one-year term, Mr. Baker reinvested the principal in a new FPCM or Fund Offering.  All told, Mr. Baker invested more than $400,000 with Woodbridge.

55.     Woodbridge represented to Mr. Baker that his investments were loans to Woodbridge, for which Woodbridge would grant him a security interest in, *inter alia*, Woodbridge's right, title, and interest in the underlying mortgage loan, and the promissory note evidencing the mortgage loan.  Woodbridge also represented to Mr. Baker that he would have "good and marketable title" to Woodbridge's underlying loans to the purported third-party buyers; his funds would be used to offer a loan for commercial real estate to a third-party buyer; he would have a recorded first-lien position; his interest payments would be made from the higher rates paid by that buyer; and that his investment was secured by the collateral for the underlying loan.

56.     At no time did Shapiro, Woodbridge, or any agent or employee thereof disclose to Mr. Baker that his funds would be allocated for purposes not authorized by Mr. Baker.  Nor did Woodbridge or Shapiro, or any other representative or agent thereof, disclose to Mr. Baker that his "loan" was unsecured; his money would not be used for a loan to a third-party buyer in an arms'-length transaction; the purported third-party borrower would not pay interest on the "loan"; his investment would be commingled with other investors funds and used to propel the Woodbridge Ponzi Scheme forward; or that Woodbridge was not a legitimate enterprise, but instead a Ponzi scheme.

57.     If these facts had been disclosed to Mr. Baker, he would not have invested his money with Woodbridge.

58.     Mr. Baker first learned that Woodbridge was not a legitimate investment after Woodbridge declared bankruptcy in December 2017.

8

10Z7355

59.     Mr. Baker has been damaged in that all or a portion of the funds that he invested in Woodbridge Mortgage Investment Funds 3 and 3A were misused, commingled, and misappropriated by Woodbridge and Shapiro.

60.     There are no material differences between Defendant's actions and practices directed to Mr. Baker and its actions and practices directed to the Class.

**Cornerstone Growth**

61.     Plaintiff Cornerstone Growth invested $50,000 with Woodbridge Mortgage Investment Fund 3A, LLC on December 16, 2016, purportedly secured by a first-priority lien on real property identified as "Sarbonne Road."

62.     Woodbridge represented to Cornerstone Growth that its investment was a loan to Woodbridge, for which Woodbridge would grant it a security interest in, *inter alia*, Woodbridge's right, title, and interest in the underlying mortgage loan, and the promissory note evidencing the mortgage loan.  Woodbridge also represented to Cornerstone Growth that it would have "good and marketable title" to Woodbridge's underlying loans to the purported third-party buyers; its funds would be used to offer a loan for commercial real estate to a third-party buyer; it would have a recorded first-lien position; its interest payments would be made from the higher rates paid by that buyer; and that its investment was secured by the collateral for the underlying loan.

63.     At no time did Shapiro, Woodbridge, or any agent or employee thereof disclose to Cornerstone Growth that its funds would be allocated for purposes not authorized by it.  Nor did Woodbridge or Shapiro, or any other representative or agent thereof, disclose to Cornerstone Growth that its "loan" was unsecured, the purported third-party borrower would not pay interest on the "loan," its investment would be commingled with other investors funds and used to propel the Woodbridge Ponzi Scheme forward, or that Woodbridge was not a legitimate enterprise, but instead a Ponzi scheme.

10Z7355

64.     If these facts had been disclosed to Cornerstone Growth, it would not have invested its money with Woodbridge.

65.     Cornerstone Growth first learned that Woodbridge was not a legitimate investment after Woodbridge declared bankruptcy in December 2017.

66.     Cornerstone Growth has been damaged in that all or a portion of the funds that it invested in Woodbridge Mortgage Invest Fund 3A were misused, commingled, and misappropriated by Woodbridge and Shapiro.

67.     There are no material differences between Defendant's actions and practices directed to Cornerstone Growth and its actions and practices directed to the Class.

**TOLLING OF THE STATUTES OF LIMITATIONS**

68.     Comerica, aware of the illegal Woodbridge scheme and its injurious effects, fraudulently concealed the scheme by failing to report it while continuing to execute account transactions on Woodbridge's behalf.

69.     Comerica, Woodbridge, and Shapiro fraudulently concealed from Plaintiffs and class members that the overwhelming majority of FPCMs and Fund Offerings were not secured by loans to holders of commercial real estate, that returns on FPCMs and Fund Offerings would be paid from similar investments, and only on condition that those future transactions occur, rather than from interest payments on the sham third-party loans described in the offering materials, that Shapiro was embezzling millions of dollars in investor funds for his own personal use and enjoyment, that Woodbridge and Shapiro had unlawfully failed to register the FPCM and Fund Offerings with government regulators, and that Woodbridge and Shapiro had entered into several consent decrees with governmental regulators requiring them to stop violating the law.

10Z7355

70.     Comerica, Woodbridge, and Shapiro were aware that Plaintiffs and class members did not know about the Woodbridge investment fraud. Comerica, Woodbridge, and Shapiro had superior and exclusive knowledge of that fraud. Despite reasonable diligence on their part, Plaintiffs and class members were kept ignorant by Comerica, Woodbridge, and Shapiro of the factual bases for these claims for relief.

71.     The FPCM and Fund Offering sales materials contained misstatements designed to entice Plaintiffs and class members to purchase "safe" and "secured" investments with returns generated by third-party borrowers' interest payments. These fraudulent misrepresentations had the effect of concealing that Woodbridge was, in fact, using only new investor funds as the source of existing investors' returns.

72.     Plaintiffs and class members reasonably relied to their detriment on Comerica, Woodbridge, and Shapiro's fraudulent concealment of their violations. As a result of this concealment, Plaintiffs and class members did not believe that it was necessary to file a lawsuit.

73.     Plaintiffs and class members did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Comerica's violations or the harm caused thereby until the SEC filed its enforcement action and the Woodbridge entities declared bankruptcy in December 2017. Plaintiffs learned of the relevant actions of Comerica, Woodbridge, and Shapiro through the bankruptcy and SEC actions and their coverage in the media. Only then did Plaintiffs retain counsel to vindicate their rights. Because Plaintiffs could not have reasonably discovered the facts constituting Comerica's violations until December 2017, all applicable statutes of limitation were tolled until then.

10Z7355

## CLASS ACTION ALLEGATIONS

**1.**      **Class Definitions**

74.      Plaintiffs bring this action against Comerica pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.   Plaintiffs seek to represent the following classes:

**Nationwide Class**

All persons who invested in Woodbridge FPCM's or Fund Offerings.

**Florida Subclass**

All persons residing in Florida who invested in Woodbridge FPCM's or Woodbridge Fund Offerings.

**Nevada Subclass**

All persons residing in Nevada who invested in Woodbridge FPCM's or Woodbridge Fund Offerings.

75.      Excluded from the class are Defendant, its parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and the Relevant Non-Parties listed above.

76.      Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

77.      The Class satisfies the requirements of Rule 23(a) and Rule 23(b)(3).The proposed classes are so numerous that joinder of all members would be impracticable.   There were approximately 8,400 investors nationwide, including more than 700 from the Southern District of

12

Florida alone.[5]

78.     The proposed Class is ascertainable, as the names and addresses of all Class members can be identified in the information or business records maintained by Comerica or the Relevant Non-Parties.

79.     Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and all other Class members invested in the Woodbridge investments at issue and were subject to the wrongful conduct alleged herein.

80.     Plaintiffs are adequate representatives of the classes they seek to represent and will fairly and adequately protect the interests of those classes.  Plaintiffs are committed to the vigorous prosecution of this action and have no conflicts or contrary interests to any unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

81.     Plaintiffs have retained competent counsel, experienced in class action and investor fraud litigation of this nature.  Plaintiffs' counsel have the financial and legal resources to meet the substantial costs that may be associated with this type of litigation.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members thereof.  The common questions of law and fact to the class members include:

    a. Whether Shapiro and Woodbridge committed fraud and breached duties to Plaintiffs and members of the class;
    b. Whether Comerica aided and abetted Shapiro and Woodbridge's fraud and breaches of their fiduciary duties to investors;
    c. Whether Comerica knowingly disregarded atypical banking activity in and among the Woodbridge accounts and other red flags that Shapiro and Woodbridge were committing investor fraud, breaching fiduciary duties, and

---

[5] Investors in the Southern District of Florida invested approximately $114 million with Woodbridge.

misappropriating investor funds; and

    d. Whether Plaintiffs and class members are entitled to damages based on their investment losses.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the classes would impose heavy burdens upon the courts and Comerica, and would create a risk of inconsistent or varying adjudications of the common questions of law and fact. The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions. Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.

84.    A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

### CAUSES OF ACTION

### COUNT I
**Aiding and Abetting Fraud**

85.    Plaintiffs re-allege and incorporate paragraphs 1-75 as if fully set forth herein.

86.    Shapiro and Woodbridge induced Plaintiffs and the class members to invest in Woodbridge by intentionally misrepresenting the nature of the investment and failing to disclose that Woodbridge was, in fact, a Ponzi scheme. Shapiro and Woodbridge told investors, *inter alia*, that (i) their invested funds would be used to offer short-term, high-interest loans to commercial third-party buyers; (ii) the loans offered to these buyers would feature low loan-to-value ratios that would protect investors and mitigate their risk; (iii) their funds were secured by the properties underlying the purported loans; and (iv) they would hold "first lien positions" in the underlying

14

properties, such that they would have priority over other liens or claims should the third-party borrower default on its mortgage loan.

87.     These representations were materially false.  In fact, Shapiro and Woodbridge commingled investor funds and directed them to pay off earlier investors, pay sales agent commissions, and fund Shapiro's personal accounts, among other things; most of the "third-party borrowers" were Shapiro-owned LLCs that had no income and never made loan payments; and investors' funds were unsecured and being used to fund Shapiro's Woodbridge Ponzi scheme.

88.     Shapiro and Woodbridge also failed to disclose to investors, inter alia, that (i) Shapiro and Woodbridge were commingling investor funds and paying earlier investors with funds obtained from later investors, and were operating a Ponzi scheme; (ii) Woodbridge had issued only $675 million of the $1.22 billion raised in loans; (iii) Shapiro was using investor funds to find his own personal accounts and make payments to his wife's business; and (iv) their investments would be unsecured. These omissions were also material.

89.     Plaintiff and class members justifiably relied on Shapiro and Woodbridge's material misrepresentations and omissions when they invested with Woodbridge, and suffered losses as a result.

90.     Comerica knowingly provided substantial assistance to Woodbridge and Shapiro in executing the Woodbridge Ponzi scheme and defrauding investors.   Among other things, Comerica:

    a.    Accepted funds for deposit that were derived from the sale of unregistered securities;

    b.    Commingled investments from Woodbridge promissory note holders and purchasers of fund offering units;

    c.    Executed atypical banking procedures to service Shapiro's complex series of accounts, such as accommodating Shapiro's insistence that he hand-sign every check to investors and sales agents;

d.   Carried out improper and atypical financial transactions such as the transfer of approximately $1.66 billion via nearly 11,000 account transactions among the Woodbridge accounts;

e.   Continued to service Woodbridge accounts after five state regulatory agencies determined that Shapiro was engaged in unlawful conduct and served him with cease-and-desist orders

f.   Failed to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

g.   Failed to implement and adhere to compliance and monitoring protocols concerning the use of Plaintiffs' and class members' investment funds;

h.   Failed to identify, monitor, or exercise required due diligence in relation to the existence or nonexistence of bona fide third-party borrowers; and

i.   Failed to prevent, report, or otherwise take corrective action in response to Shapiro's misappropriation and misuse of investor funds.

91.   In connection with providing substantial and material assistance to Shapiro and Woodbridge, Comerica was aware of its role in the Woodbridge Ponzi scheme and acted knowingly in assisting Woodbridge and Shapiro.

92.   Comerica substantially benefited from its participation in the Woodbridge Ponzi scheme. The scheme caused Comerica to earn income from fees and from investing the capital Woodbridge investors had deposited.

93.   As a direct and proximate result of Comerica's aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty

94.   Plaintiffs re-allege and incorporate paragraphs 1-75 as if fully set forth herein.

95.   At all relevant times, Shapiro was the CEO of Woodbridge and the trustee of the RS Protection Trust.

96.   At all relevant times, Shapiro maintained complete or substantially complete control over the Woodbridge Group of Companies and each of the Woodbridge investment funds.

10Z7355

Shapiro had complete control, and was the sole signatory for, the Comerica bank accounts in which investor funds were deposited. Shapiro also wrote investors personally, characterizing collateral as "senior" and promising them satisfactory returns.

97.     By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, Shapiro owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith. By selling Plaintiffs and class members promissory notes and fund offerings pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, Shapiro breached fiduciary duties he owed to Plaintiffs and class members.

98.     Comerica substantially assisted in Shapiro's breaches of fiduciary duty with knowledge that Shapiro was breaching those duties.

99.     As a direct and proximate result of Comerica's aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

### COUNT III
**Negligence**

100.     Plaintiffs re-allege and incorporate paragraphs 1-75 as if fully set forth herein.

101.     Shapiro and Woodbridge deposited customer funds from Plaintiffs and class members into Comerica bank accounts.

102.     Comerica knew or should have known that funds raised from Woodbridge investors constituted investor funds. Comerica knew or should have known that it was subject to various common law and regulatory requirements related to monitoring accounts at Comerica, including regulations issued to prevent money laundering and other illicit behavior.

10Z7355

103.    Comerica owed a duty to Plaintiffs and class members to take reasonable care with regard to the maintenance and use of investor funds on deposit at Comerica. As set forth more fully above, Comerica breached this duty of care by, among other things:

a.    Failing to employ reasonable care in connection with the maintenance and use of Woodbridge investor fund;

b.    Failing to identify, monitor, or exercise requisite due diligence related to the discrepancies and inconsistencies that characterized Shapiro and Woodbridge's deposits and outlays of investor funds;

c.    Failing to implement and adhere to compliance and monitoring protocols concerning Shapiro and Woodbridge's maintenance and use of investor funds;

d.    Failing to identify, monitor, or exercise requisite due diligence related to the regulatory and compliance "red flags" detailed herein, including after the issuance and publication of several state cease-and-desist and consent orders;

e.    Failing to prevent or take any appropriate action in response to Shapiro and Woodbridge's use of funds from new investors to pay sums owed to earlier investors;

f.    Failing to prevent or take any appropriate action in response to Shapiro's embezzlement of investor funds for personal luxuries;

g.    Causing and allowing investor funds to be misappropriated and misused; and

h.    Failing to notify investors or any governmental entity or regulator of Shapiro and Woodbridge's misappropriation and misuse of investor funds.

104.    As a direct and proximate result of Comerica's breach of duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendant as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, and declaring Plaintiffs and their counsel to be representative of the Classes sought in this Complaint;

18

10Z7355

(2)    Awarding damages or restitution, including pre-judgment interest on each count;

(3)    Awarding reasonable attorneys' fees and costs of litigation; and

(4)    Awarding such other and further relief the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs request a jury trial for all Counts that the law permits a jury to decide.

Respectfully submitted this 12th day of March, 2018.

/s/ *Harley S. Tropin, Esq.*
Harley S. Tropin, Esq.
Florida Bar No. 241253
hst@kttlaw.com
Gail A. McQuilkin, Esq.
Florida Bar No. 969338
gam@kttlaw.com
Rachel Sullivan, Esq.
Florida Bar No. 815640
rs@kttlaw.com
Robert J. Neary, Esq.
Florida Bar No. 81712
rn@kttlaw.com
Daniel Maland, Esq.
Florida Bar No. 114932
dmaland@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone:  (305) 372-1800
Facsimile:    (305) 372-3508

William R. Scherer, III
Florida Bar No. 041671
william@srmxlaw.com
**SCHERER & MARX, PLLC**
633 South Federal Highway, 4th Floor
Fort Lauderdale Florida 33301
Telephone: (954) 482-1660

*Counsel for Plaintiffs*

19

10Z7355